UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

INVUE SECURITY PRODUCTS, INC.,

      Plaintiff,

                                CASE NO.:  8:18-cv-02548-VMC-SPF

v.

VANGUARD PRODUCTS GROUP, INC.
d/b/a VANGUARD PROTEX GLOBAL,

      Defendant.
_____/

**DEFENDANT, VANGUARD PRODUCTS GROUP, INC.'S MOTION TO STAY THE CASE PENDING RESOLUTION OF THE *INTER PARTES REVIEW* AND SUPPORTING MEMORANDUM OF LAW**

Defendant, Vanguard Products Group, Inc. ("Vanguard"), respectfully moves the Court on the following grounds for an order staying this patent infringement litigation pending resolution of two petitions for *inter partes* review ("IPRs") filed with the U.S. Patent Trial and Appeal Board (the "PTAB") regarding the two patents at issue to which Vanguard denies infringement.

1.     This case involves the alleged infringement of eight (8) patents.  Two of those patents (U.S. Patent No. 9,818,274 ("the '274 patent") and U.S. Patent No. 10,062,253 ("the '253 patent")) are the main patents at issue and are collectively referred to as the "Optical Patents".  The remaining six patents involve only nominal features of the products at issue (collectively, the "Nominal Patents").

2.     Vanguard asserts that the Optical Patents are invalid because the inventions claimed in them would have been obvious, in light of the prior art, to one skilled in the art at the time of the claimed inventions.  Vanguard, however, is not contesting the validity or infringement by the accused products of the nominal patents.

1

3. Earlier today, Vanguard filed IPRs with the PTAB challenging the validity of each the Optical Patents.

4. Vanguard now seeks to stay this case pending the PTAB's resolution of those IPRs because doing so will promote judicial economy, streamline the issues in this case, and will not result in prejudice to any party.

WHEREFORE, Vanguard respectfully requests that this Court stay this case pending the PTAB's resolution of the IPRs and grant all such further relief as this Court deems appropriate.

## CERTIFICATE OF GOOD FAITH CONFERENCE

UNDERSIGNED COUNSEL HEREBY CERTIFIES that on June 18, 2019, Vanguard's co-counsel conferred with Plaintiff's counsel, Tim F. Williams, before filing the instant motion and Plaintiff's counsel advised that InVue does not consent to the requested stay of this case.

*s/ Richard E. Fee*
Richard E. Fee

## SUPPORTING MEMORANDUM OF LAW

Pursuant to Local Rule 3.01, Vanguard submits this memorandum of law in support of its Motion to Stay.

**A.     INTRODUCTION**

On October 16, 2018, InVue Security Products, Inc. ("InVue") initiated this patent infringement case against Vanguard. InVue's Complaint [Dkt. #1] alleges that Vanguard (a competitor of InVue) is infringing eight (8) patents comprising hundreds of claims. In an effort to streamline this otherwise unmanageable case and because Vanguard is redesigning its accused products, Vanguard chose not to contest that its accused products infringed the six (6) Nominal

Patents.  On June 18, 2019[1], Vanguard filed two IPRs (IPR2019-01206 and IPR2019-01209) challenging the validity of the two patents asserted by InVue as to which Vanguard contests infringement in this case.  Copies of those two IPRs are attached hereto as Exhibits A and B, respectively.  Because the resolution of those IPRs is likely to affect the primary issues in this case, Vanguard respectfully requests this Court to stay the case pending the resolution of those IPRs.

Granting a stay in this case will significantly reduce the burden of litigation and simplify the issues without resulting in any prejudice to InVue or tactical advantage to Vanguard.  This case is in its very early stages.  InVue's Opening Clam Construction Brief is not due until October 18, 2019, and none of the following deadlines have not even been scheduled:  claim construction hearing, close of fact discovery, expert discovery, summary judgment motions, motions *in limine* and *Daubert* motions, pretrial conference, or trial.  No depositions have been taken or even noticed.  Although InVue filed a Motion for Preliminary Injunction, it appears it did so in an effort to pre-empt this very motion.  This issue is addressed both in Vanguard's Response in Opposition to InVue's Motion for Preliminary Injunction [Dkt. # 57].

## C.   OVERVIEW OF THE TECHNOLOGY AT ISSUE

The technology at issue relates to security devices used to prevent theft of consumer electronic products, such as mobile phones, from display counters in retail stores.  Conventional security devices use a retractable cable stored within a recoiler to both power the product and allow a customer to pull the product away from the display counter.  When the customer wants to hold/inspect/operate a product, the customer pulls the it away from the display and the cable is drawn out of the recoiler.  When the customer is finished and places the phone back on the display,

---

[1] Under the Rules of the United States Patent Trials and Appeals Board, Vanguard had to wait nine (9) after the challenged patents issued to file IPRs against them.

the cable automatically retracts back into the recoiler. If the person attempts to steal the product by cutting or removing the cable, an alarm sounds.

**D.      THE PATENTS-IN-SUIT AND PRIOR ART CITED IN IPRs**

Although InVue has asserted eight (8) patents in this case, the main patents-in-suit are U.S. Patent No. 9,818,274 ("the '274 patent") and U.S. Patent No. 10,062,253 ("the '253 patent"). The '274 Patent and the '253 Patent are collectively referred to as the "Optical Patents". InVue is asserting a combined thirty-one (31) claims from these two Optical Patents alone. Figure 5 of both patents, reproduced below, depicts the preferred embodiment of the claimed invention in the Optical Patents:



The security device claimed in the Optical Patents has a recoiler [22][2] inside a base [18], and a cable [20] is wrapped around the recoiler [22] and extends therefrom. A sensor [12] is attached to one end of the cable [20] and then attached to the secured merchandise [14]. The sensor [12] has a transceiver [42] aligned with a transceiver [42] on the cable [22]. Customers can pull

---

[2] The cited numbers refer to the corresponding numbers and components shown in Figure 5 in the Optical Patents.

the merchandise [14] away from the base [18] and the cable [20] is withdrawn out of the recoiler [22]. When the customer is finished and places the merchandise back on the base, the cable [20] is automatically retracted back into the recoiler [22]. If a customer attempts to steal the merchandise [14] by cutting the cable [20], the transceiver [42] within the cable will lose power and will not be able to send or receive optical signals, which would trigger an alarm. Likewise, if a customer were to disconnect the cable [20] from the sensor [12], the two transceivers [42] would become separated and, therefore, will not be able to receive each other's signals, thus also causing an alarm to sound.

A key piece of prior art cited in the IPRs is International publication no. WO 2011/045058 ("Brenner"). Specifically, the security device disclosed in Brenner is shown in Figure 2, which is reproduced and annotated below:



Brenner discloses virtually the same security system as the Optical Patents at issue. The security device disclosed in Brenner has a recoiler (winding device [15]) inside a base [3] and a

cable [22] that is wrapped around the recoiler [15] and extends therefrom. A sensor [4] is attached to one end of the cable [6] and then attached to the secured merchandise [2]. The sensor [14] has a push-button [8] which is pressed when the merchandise is attached to the sensor [11]. Brenner further discloses that the sensor [4] is equipped with an optical transmitter and an optical receiver, which collectively form an optical transceiver. Another optical transceiver is placed inside the base [3]. The two optical transceivers are connected to the ends of the cable [6] and can communicate optical signals to one another across the optical waveguide within the cable [6]. If the sensor [4] detects an alarm condition—for example, if the merchandise [2] is detached from the cable [6], the push-button will be released—the optical transceiver of the sensor [4] sends out an optical signal, which is then transmitted across the cable [6] and is received by the second optical transceiver, and the alarm will sound.

With the invention disclosed in Brenner, customers can pull the merchandise [2] off of the base [3] to have a hands-on interaction. As the customer lifts the merchandise [2], the cable [6] is withdrawn out of the recoiler [15]. When the customer is finished, the customer places the merchandise [2] back on the base [3] and the cable [6] is retracted back into the recoiler [15]. If a person attempts to steal the merchandise [2], an alarm will sound.

The only physical difference between the security device described in Brenner and InVue's Optical Patents is the location of the second optical transceiver: in Brenner, it is located in the base, while it is located in the cable in the Optical Patents. Indeed, the security device of Brenner is so similar to the security device claimed in the Optical Patents that both the Canadian and European Patent Offices rejected the claims identical to those of the '274 Patent and nearly identical to those of the '253 Patent for being obvious in light Brenner. As of today, all claims in

Canada and Europe remain rejected. The following is an excerpt from the rejection in Canada, which is informative:

> In [Brenner], the system comprises transceivers at the sensor and at the base, with the optical cable connected in between. ***It would have been obvious for a person skilled in the art to move the location of the transceiver to be attached to the cable as necessary.*** Therefore, the subject matter of claim 1 would have been obvious to a person skilled in the art with knowledge of [Brenner].
> …
> ***Dependent claims 2 – 38 … all recite minor variations and features that are either explicitly disclosed in [Brenner], or are considered to be implementation specific design options that would have been obvious to a person skilled in the art with knowledge of [Brenner]***.

Canadian Patent Office Rejection of Application No. 2,974,544 dated February 4, 2019 (emphasis added). European Patent Office rejected the European claims on the same ground. Copies of the rejections from the Canadian and European Patent Offices are attached hereto as Exhibits C and D, respectively.

Although most claims of the Optical Patents are likely rendered obvious by Brenner by itself, as evidenced by the obviousness rejections from the Canadian and European Patent Offices, the IPRs filed by Vanguard go even further to ensure that there is no ambiguity as to their unpatentability. In addition to Brenner, Vanguard's IPRs cite U.S. Patent No. 6,169,295 ("Koo"), which explains that optical transceivers have been "well known and [] commercially available" since at least 1998—long before InVue filed its Optical Patents. IPRs also cite U.S. Patent No. 6,150,940 ("Chapman"), which establishes that anti-theft devices using cables with integrated optical sensors have been known at least as of August 10, 1999. A final key reference cited in the IPRs is U.S. Patent No. 5,912,619 ("Vogt"), which issued on June 15, 1999. Vogt discloses a security device in which two optical transceivers exchange optical signals back-and-forth to confirm that they both remain aligned and energized. If the optical transceivers fail to exchange

correct optical signals—for example, if one of the transceivers is deenergized or if the optical transceivers have been separated—an alarm is triggered.

Figures 3 and 9B of Vogt clearly show that InVue did not invent the technique of using two proximally-placed optical transceiver to monitor a cable connection. Figures 3 and 9B are reproduced and annotated below:





FIG. 9B

Vanguard's IPRs establish that it would have been obvious for a person of ordinary skill in the art to modify the prior art security device disclosed in Brenner by relocating one of the optical transceivers from the base into the end of cable. This would enable the optical transceiver of sensor to directly communicate with the optical transceiver of the cable, as disclosed in Vogt. In this improved security device, the optical waveguide within the tether cable—which is prone to signal loss when bent or wound (discussed in great detail in the IPRs and supported by the Communications Standard Dictionary and the expert declaration) would be replaced with standard electrical connectors, which do not suffer from signal loss when bent or wound in a recoiler. Cutting of the cable would deenergize the transceiver of the cable and the alarm would sound. Likewise, disconnecting the cable would separate the optical transceivers, also triggering an alarm.

Every feature of the Optical Patents has been known prior to their effective filing date. A person of ordinary skill in the art would have recognized that the security system disclosed in Brenner may suffer from reliability issues caused by signal loss in the optical waveguide, and,

9

therefore, would have been motivated to improve the security device of Brenner per the teachings of Koo, Vogt, and Chapman, by simply relocating the optical transceiver from the base unit into the securing tether and replacing the optical waveguide with standard electrical conductors. *See Plantronics, Inc. v. Aliph, Inc.*, 724 F.3d 1343, 1354 (Fed. Cir. 2013) ("[M]otivation to combine may be found explicitly or implicitly in market forces; design incentives; the interrelated teachings of multiple patents; any need or problem known in the field of endeavor at the time of invention and addressed by the patent; and the background knowledge, creativity, and common sense of the person of ordinary skill.") (internal quotations and citations omitted). The resulting combination of Brenner, Koo, Vogt, and Chapman teaches all structural and functional limitations of the Optical Patents. This combination of prior art would predictably result in an improved security device, in which known components would perform their intended functions.

Accordingly, the Optical Patents claim nothing more than an obvious combination of well-known components and technologies preforming their intended functions in an expected and predictable manner. The governing law is unambiguous: "when a patent 'simply arranges old elements with each performing the same function it had been known to perform' and yields no more than one would expect from such an arrangement, the combination is obvious." *KSR Intern. Co. v. Teleflex Inc.*, 550 U.S. 398, 417 (U.S. 2007) (citation omitted). Therefore, the Optical Patents are invalid.

Each of the asserted thirty-one (31) claims of the Optical Patents requires the use of aligned transceivers to send and receive optical signals. Using transceivers to send and receive optical and electrical signals, however, is not novel. That technology has been well known and widely used in the prior art. However, the patent examiner did not consider either Brenner or Vogt during examination of the Optical Patents. In Canada and Europe, patent examiners found the claims of

10

the Optical Patents are obvious even in light of Brenner by itself, even without being combined with Vogt and other prior art cited in the IPRs.

**C.   THE SIX NOMINAL PATENTS AT ISSUE ARE INCONSEQUENTIAL**

The six (6) Nominal Patents asserted by InVue in this case are extremely narrow in scope and trivial in nature. Instead of incurring the cost of arguing the validity or infringement of these six patents and numerous claims, Vanguard made the logical business decision to simply modify its product design so that InVue could no longer assert, in good faith, infringement of any of those six (6) Nominal Patents by Vanguard's redesigned products that will likely ship in August 2019.

**1.  The "Port Patents"**

Three (3) of InVue's patents-in-suit claim a "port" or opening [45] in the back of the base [18] to connect a secondary piece of merchandise (the "Port Patents"). The claimed invention of the Port Patents is shown below in Figure 3 from U.S. Patent Nos. 9,747,765; 9,805,564; and 10,043,358:



FIG. 3

Vanguard has modified its product to eliminate the "port" claimed in InVue's Port Patents, and thus these three patents are no longer at issue.

**2. The "Angle" Patent**

U.S. Patent No. 10,008,082 claims the interior sound chamber in the base to be at an angle relative to the base. That invention is depicted in Figure 8 of that patent and is shown below:



FIG. 8

Once again, Vanguard modified its product to eliminate the angle of the sound chamber. Thus, this patent is no longer at issue in any material respect.

**3. The "Recess Patent"**

U.S. Patent No. 9,972,178 claims a recess in the sensor to allow a cable to be removably inserted. Figure 7 of that patent depicts the claimed invention:



Vanguard has eliminated the recess in the sensor and Vanguard's redesigned product permanently connects the cable to the side of the sensor by a hard-wire connection. Thus, this patent is no longer materially at issue.

12

### 4. The "Cam Patent"

U.S. Patent No. 10,098,481 claims an internal cam mechanism with interlocking engagement members to lock the sensor within the base so that a customer cannot withdraw the merchandise away from the base.

Vanguard's redesigned product eliminated the cam mechanism and simply uses a screw that holds the sensor by friction. Thus, this patent is no longer materially at issue.

### D.  THIS CASE SHOULD BE STAYED PENDING THE OUTCOME OF THE IPRS

The law and facts both support staying this case pending the resolution of the IPR process.

### 1. Legal Standards

It is well established that "[c]ourts have inherent power to manage their dockets and stay proceedings, including the authority to order a stay pending conclusion of a PTO [administrative proceeding]." *Ethicon, Inc. v. Quigg*, 849 F. 2d 1422, 1426-27 (Fed. Cir. 1988). It is within this Court's "sound discretion" to stay this action. *See Lightning Science Group Corp. v. Nicor, Inc.*, 2017 WL 3706697 at *2 (M.D. Fla. May 9, 2017) (granting motion to stay before PTAB granted petition for IPR).

In deciding whether to stay a patent infringement action in favor of a PTAB proceeding concerning the validity of the asserted patent, the District Court considers:

> (1) whether a stay would *unduly* prejudice or present a clear tactical disadvantage to the non-moving party; (2) whether a stay will simplify the issues in question and trail of the case; and (3) whether discovery is complete and whether a trial date has been set.

*Patent Asset Licensing, LLC v. Bright House Networks, LLC*, 2017 WL 3706697, *2 (M.D. Fla. Aug. 22, 2016) (emphasis added) (granting motion to stay before PTAB instituted IPR). Additionally,

> [C]ourts in the Eleventh Circuit have … stayed cases <u>before</u> the PTAB has decided whether to institute an *inter partes* review, noting the concrete, numerous, and well-recognized benefits of resort to the PTO as (1) furthering judicial economy; (2) determining validity; (3) focusing the issues, defenses, and evidence; (4) developing the prior art and prosecution history; (5) obtaining the PTO's particular expertise; (6) encouraging settlement; and (7) reducing costs to the parties.

*Id.*, at *3 (emphasis in original).

Indeed, the Middle District of Florida routinely grants stays even before the PTAB institutes the IPR (or reexamination). *See Lightning Science*, 2017 WL 3706697 at *3; *Patent Asset*, 2016 WL 4431574 at *5; *The Andersons, Inc. v. Enviro Granulation, LLC*, 2014 WL 4049886, *4 (M.D. Fla. Aug. 14, 2014); *Capriola Corp. v LaRose Indus., LLC*, 2013 WL 1868344, *3 (M.D. Fla. March 11, 2013); *see also Alps South, LLC v. Ohio Willow Wood Co.*, 2008 WL 8793609, *1 (M.D. Fla. Dec. 3, 2008)(granting motion to stay before PTAB granted reexamination request); *Waterblasting LLC v. Blasters, Inc.*, Case No. 18:17-cv-2660-T-36MAP, Dkt. #24 (granting motion to stay two weeks after filing, and before institution, of IPR). The Middle District of Florida recognizes the streamlining effect of granting a stay <u>prior</u> to the IPR's institution. "[I]f the PTO declines *inter partes* review, little time is lost, but if the PTO grants *inter partes* review, the promise is greater for an important contribution by the PTO to resolution of the governing issues in the litigation." *Capriola*, 2013 WL 1868344 at *2 (granting pre-institution stay); *see also Andersons*, 2014 WL 4059886 at *4 (granting pre-institution stay).

### a. <u>Staying litigation will not unduly prejudice either party.</u>

Neither party will be unduly prejudiced by staying the litigation now. Although a stay will cause some delay if the IPR is ultimately unsuccessful, "[**m]ere delay** in the litigation does ***not*** establish ***undue*** prejudice." *CANVS Corp. v. Nivisys, LLC*, 2014 WL 6883123, * (M.D. Fla. Dec. 5, 2014)(emphasis added). Moreover, "any such delay is outweighed by the many advantages of *inter partes* review." *Andersons*, 2014 WL 4059886 at *2.

Moreover, Vanguard has acted diligently. Vanguard filed IPRs almost immediately upon the expiration of the nine-month waiting period following the grant of the patents at issue. Vanguard then filed this motion to stay of litigation immediately after filing of its IPR petitions. Vanguard's quick action shows that it lacks a dilatory motive in seeking a stay.

Finally, any concerns about a litigation delay are tempered by the speed at which the PTAB is statutorily required to conduct IPRs. The IPR process "(1) reduces to 12 months the time the PTO spends reviewing validity; (2) minimizes duplicative efforts by increasing coordination between district court litigation and *inter partes* review; and (3) allows limited discovery in the review proceedings." *Andersons,* 2014 WL 4059886 at *1, citing *Automatic Mfg. Sys. v. Primera Tech.*, 2014 WL 6133763, at *2 (M.D. Fla. 2014). "After a petition for *inter partes* review is filed, the patent owner has three months to submit a preliminary response. 35 U.S.C. § 313. Within three months of that date, the PTAB will institute a review if "there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition." 35 U.S.C.§ 314(b). If the PTAB institutes an IPR for any of the claims in the Petition, it must issue a final written decision within one (1) year of the date of the decision to institute the IPR. 37 C.F.R. § 42.100.[3] Consequently, the PTAB's final decision would more than likely be made by approximately December 17, 2020.

As of January 31, 2019, IPRs have been instituted just under seventy percent (70%) of the time, with some or all of claims being invalidated in over eighty percent of instituted proceedings. *See* https://www.uspto.gov/sites/default/files/documents/trial_statistics_jan2019.pdf (pp. 6, 10).

---

[3] "An inter partes review proceeding **shall be** administered such that pendency before the Board after institution is normally no more than one year. The time can be extended by up to six months for good cause by the Chief Administrative Patent Judge." 37 C.F.R. § 42.100(c) (emphasis added).

### b. A Stay Will Reduce The Burden of Litigation on the Court and Parties

Minimal discovery has taken place. No depositions have been taken or even noticed and expert discovery has not begun. Moreover, the Patent Scheduling Order [Dkt. #34] has no dates set for the close of fact discovery, expert discovery, summary judgment motions, motions *in limine* and *Daubert* motions, pretrial conference, or trial.

The fact that most of the work and expense in this case will not occur until later this year and in 2020, favors a stay. *See Andersons*, 2014 WL 4059886 at *3 ("with a trial set to occur more than one year from the present time, it is fair to say that this case is in its early stages"); *Automatic*, 2014 WL 6133763 at *4 (court holding the case was in its "early stages" and case stayed as discovery was open for eight months and trial was scheduled to occur in 16 months); *Jerry Harvey Audio*, 2016 WL 7177548 at *9 (M.D. Fla. 2016)(case stayed when the case was not set for trial); *Intelligent Automation Design v. Zimmer Biomet CMF*, 2017 WL 2211670 at *1 (M.D. Fla.) (court holding the case "is still in its infancy" and case stayed when trial was scheduled in 18 months); *Lightening Science Group v. Nicor*, 2017 WL 3706697 at *2 (M.D. Fla.) (holding the case was "not advanced" and case stayed when the court had not conducted the claim construction hearing and the trial date was not set); *Patent Asset Licensing*, 2016 WL 4431574 at *4 (court holding the case was "at a relatively early stage" when fact discovery was still ongoing and case stayed).

In light of the very early stage of this case, absent a stay the Parties will invariably expend significant time and resources "conducting discovery, engaging in claim construction and preparing for trial. However, a decision by the Patent Office to grant *inter partes* review of the two optical patents could render these efforts entirely moot.

16

### c. A Stay Will Simplify The Issues

It is advantageous for the PTAB, with its recognized legal and technical expertise, to address the unpatentability arguments first. *Jerry Harvey Audio*, 2016 WL 7177548 at *9; *Lightening Science Group,* 2017 WL 3706697 at *2, 3. The IPRs will resolve the issue of validity of the two main patents in this case. Either the PTAB will invalidate the '274 and '253 patents or hold that they are valid. In either event, the case will be greatly simplified and obviate the need for any fact or expert discovery on that issue. *Jerry Harvey Audio,* 2016 WL 7177548 at *9; *Lightening Science Group,* 2017 WL 3706697 at *2, 3.

### d. There Is No Prejudice Or Tactical Advantage

Moreover, a "delay in litigation, without more, generally does not demonstrate undue prejudice." *Andersons*, 2014 WL 4059886 at *2; *Patent Asset Licensing*, 2016 WL 4431574 at *3. As explained in *Andersons* "if the PTO declines *inter partes* review, little time is lost, but if the PTO grants *inter partes* review, the promise is greater for an important contribution by the PTO to[ward] resolution of the governing issues in the litigation." *Andersons*, 2014 WL 4059886 at *4.

Moreover, Vanguard did not seek a tactical advantage and delay in filing its IPRs with the PTAB or moving for this Court for a stay. At the December 14, 2018 Scheduling Conference, Vanguard's counsel advised the court that it was contemplating filing IPRs depending upon the results of its investigation and design arounds. *See* Transcript of December 14, 2018, Scheduling Conference, p. 27, line 10 – p. 28, line 2, cited excerpts of which are attached as Exhibit E.

The fact that Vanguard and InVue are direct competitors does not alter the conclusion that this case should be stayed. As discussed above, having the expertise of the PTAB resolve the issue of invalidity of the main patents in this case will be of tremendous value. There is no immediate urgency to proceed and any resulting damages may claim to suffer may be remediated with money

damages. *Lightening Science,* 2017 WL 3706697 at *3; *Patent Asset Licensing*, 2016 WL 4431574 at *3; *Andersons*, 2014 WL 4059886 at *3; *Automatic*, 2014 WL 6133763 at *3.

Nor does the fact that InVue is asserting eight patents argue against a stay. Resolving the issue of validity for the two main patents will greatly simplify the case and lighten the burden on the parties and the court. This is particularly true because Vanguard is implementing design changes to render the six other patents moot going forward. *See Milwaukee Electrical Tool Corp. v. Hilti, Inc.*, 138 F.Supp.3d 1032 (E.D. WI. 2015) (stay granted when IPRs were filed on three of the eight asserted patents and significant fact discovery had occurred, expert discovery had not begun and fact discovery remained open for two months); *Acqis, LLC v. EMC Corp.*, 109 F.Supp.3d 352 (D. MA. 2015) (stay granted where IPRs filed on two of eleven asserted patents).

This same situation just occurred in a case where InVue sued another competitor, Mobile Tech., Inc. ("MTI"). InVue filed 6 cases against MTI regarding eight patents in multiple jurisdictions. All these cases were ultimately consolidated into one case in Oregon (3:17-cv-01356). MTI filed IPRs and moved for a stay, which the district court granted. over InVue's objection. While that case was stayed, the PTAB invalidated **all eight of the patents InVue asserted against MTI.** On March 7, 2019, the Federal Circuit Court of Appeals affirmed the invalidity of those patents. Vanguard is confident that the same will occur in this case.

### E.     CONCLUSION

This case should be stayed pending the PTAB's resolution of the IPRs filed against the Optical Patents. Doing so will result in judicial economy and a significant narrowing of the issues in this case without prejudicing any party. For all these reasons, this Court should grant Vanguard's Motion to Stay.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on June 18, 2019, I filed a true and accurate copy of the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following: **James M. Matulis, Esq.**, 9806 Gretna Green Dr., Suite 100, Tampa, FL 33626 (jim@matulislaw.com) and **Tim F. Williams, Esq.**, Dority & Manning, P.A., P.O. Box 1449, Greenville, SC 29602-1449 (timw@dority-manning.com), counsel for Plaintiff.

*/s/ Richard E. Fee*
Richard E. Fee
Florida Bar No. 813680
Kathleen M. Wade
Florida Bar No. 127965
FEE & JEFFRIES, P.A.
1227 N. Franklin Street
Tampa, Florida 33602
(813) 229-8008
rfee@feejeffries.com
kwade@feejeffries.com
aperez@feejeffries.com

and

Lee Grossman
(Admitted *Pro Hac Vice*)
Grossman Law Offices
225 W. Washington St., Suite 2200
Chicago, IL 60606
Phone: (312) 621-9000
lgrossman@grossmanlegal.com

*Counsel Defendant, Vanguard Products Group, Inc.*